UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

_____

CELESTINE DUBIE,

          Plaintiff,

   v.                                 21-CV-744-LJV
                                                DECISION & ORDER

BUFFALO CONCRETE ACCESSORIES,
INC.,

          Defendant.

_____

On June 16, 2021, the *pro se* plaintiff, Celestine Dubie, commenced this action against the defendant, Buffalo Concrete Accessories, Inc. ("Buffalo Concrete"). Docket Item 1. She alleges that Buffalo Concrete discriminated against her based on race and color, sexually harassed her, subjected her to a hostile work environment, and retaliated against her in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e *et seq.* Docket Item 1; *see* Docket Item 3 (Equal Employment Opportunity Commission ("EEOC") charge and right-to-sue letter). On July 19, 2021, Buffalo Concrete moved to dismiss the complaint, Docket Item 8; on August 10, 2021, Dubie responded, Docket Item 13; and on August 24, 2021, Buffalo concrete replied, Docket Item 15.

On March 28, 2022, this Court issued a decision finding that Dubie's complaint was subject to dismissal for failure to state a claim but granting her leave to file an amended complaint. Docket Item 17. On May 19, 2022, Dubie filed an amended complaint, Docket Item 18, and on June 21, 2022, Buffalo Concrete moved to dismiss the amended complaint, Docket Item 19. Dubie did not respond to Buffalo Concrete's

motion, so on August 2, 2022, this Court ordered Dubie to show cause why it should not

decide the motion to dismiss based only on Buffalo Concrete's papers.  Docket Item 26.

More than four months have passed since that order and Dubie still has not responded,

so the Court now decides the motion to dismiss based only on Buffalo Concrete's

papers.

For the following reasons, Buffalo Concrete's motion to dismiss is granted.

## FACTUAL BACKGROUND[1]

Dubie was employed by Buffalo Concrete from April 29, 2019, until her

employment was terminated on January 17, 2020.  Docket Item 1 at ¶¶ 4-6; Docket Item

---

[1] On a motion to dismiss, the court "accept[s] all factual allegations as true and draw[s] all reasonable inferences in favor of the plaintiff."  *Trs. of Upstate N.Y. Eng'rs Pension Fund v. Ivy Asset Mgmt.*, 843 F.3d 561, 566 (2d Cir. 2016).  In deciding the motion, the court may consider any written documents that are attached to the complaint, incorporated by reference, or integral to it.  *Sira v. Morton*, 380 F.3d 57, 67 (2d Cir. 2004).

In its previous decision, this Court informed Dubie that "any written material she seeks to include in any amended complaint should be attached to the amended complaint or incorporated by reference."  Docket Item 17 at 2 n.1 (citing *Sira*, 380 F.3d at 67).  But it did not tell her that an amended complaint is intended to completely replace the prior complaint and thus "renders [any prior complaint] of no legal effect." *Int'l Controls Corp. v. Vesco*, 556 F.2d 665, 668 (2d Cir. 1977) (citations omitted); *see also Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1128 (2d Cir. 1994).  Because Dubie may not have been aware of the consequences of filing an amended complaint, and because "[a] *pro se* complaint is to be read liberally," *Cuoco v. Moritsugu*, 222 F.3d 99, 112 (2d Cir. 2000) (citation omitted), this Court now considers the allegations in both Dubie's original complaint, Docket Item 1, and her amended complaint, Docket Item 18.

As it did in its previous decision, Docket Item 17 at 2 n.1, the Court also considers four documents that Dubie's original complaint incorporated by reference: 1) the EEOC charge, Docket Item 3 at 2; 2) the EEOC right-to-sue letter, *id*. at 3; 3) the EEOC notice, *id*. at 4; and 4) Dubie's June 4, 2019 email to Mary Hartley, Docket Item 12 at 10.  Finally, the Court considers two documents that Dubie's amended complaint incorporates by reference: 1) Dubie's appeal letter addressed to the New York State

3 at 2; Docket Item 18 at 6.  Buffalo Concrete has between five and ten employees.
Docket Item 1 at ¶ 2.

　　　While employed by Buffalo Concrete, Dubie noticed "supremacist behavior" and
was subjected to "microaggression[s]; racial bias[]; workplace harassment; racial slurs;
[racist] jokes [and] stereotype[s; and] sexual innuendo."  Docket Item 1 at ¶ 13; Docket
Item 18 at 3.  "All [of these] acts were carried out . . . by [Peter Gaglio,] the then[-
general manager and] now co-owner" of Buffalo Concrete.  Docket Item 1 at ¶ 19;
Docket Item 18 at 5.  Other Buffalo Concrete employees, including Mary Hartley, a
supervisor, Docket Item 18 at 3; Ken Brege, the warehouse manager, *id.* at 4; and Ken
Buchnowski, Docket Item 12 at 16, "followed [Gaglio's] lead" and engaged in this
conduct, Docket Item 1 at ¶ 19.[2]

　　　When Dubie first joined Buffalo Concrete, she asked why her workload was so
heavy.  Docket Item 18 at 3.  In response, Hartley began an "unwelcomed discussion"
about Buffalo Concrete's "previous Black female employees."  *Id.*  As part of her
explanation about why each former employee had left the company, Hartley included
"micro-aggression[s]," claiming that one employee "only worked long[] enough just to
get unemployment," that another "smelled," and that a third "was so angry that she

_____

Department of Labor Appeal Board, Docket Item 12 at 15-17; and 2) excerpts from
Buffalo Concrete's employee handbook, *id.* at 2-9.

　　　Dubie attached several other documents to her response to the first motion to
dismiss, *see* Docket Items 12 and 14, but the Court does not consider them because
neither of Dubie's complaints refers to those documents.

　　　[2] In her amended complaint, Dubie misspelled Brege's last name as "Breige" and
Buchnowski's last name as "Buchanowski."  Docket Item 12 at 16; Docket Item 18 at 5;
Docket Item 20 at 12 n.2, 23 n.4.

deleted files to cripple the company."  *Id.*  As Hartley "str[uck] down . . . the former employees['] character[s], [Dubie] felt 'put on notice'" as to her own behavior.  *Id.*

Throughout Dubie's employment, she "heard comments such as 'coon' and 'roots' from [her] co-workers and potential new boss."  Docket Item 3 at 2.  For example, Brege once told Dubie an "unwarranted joke," Docket Item 18 at 4, about a "black guy" who worked in the warehouse for one day but who did not return after Brege gave him a hat that had "roots on it," Docket Item 12 at 16 (some capitalization omitted).  Hartley once used the phrase "I haven't seen you in a coon's year" while talking on the phone and smiling at Dubie.  *Id.*; Docket Item 18 at 4.  Dubie researched the meaning of that phrase, Docket Item 3 at 2, and when Buffalo Concrete saw an email about her research, Gaglio began "blind carbon cop[ying]" himself on Dubie's emails "without [her] knowledge," *id.*; Docket Item 12 at 16.

Buffalo Concrete employees made other racist comments during Dubie's tenure with the company.  For example, Buchnowski referred to a group of new employees—all people of color—as "a regular 'fuckin[g]' bowl of Mexican soup."  Docket Item 12 at 16.  On January 3, 2020, Brege told Dubie that she should "tie shoestrings" on a pair of shoes she had thrown out and "throw [them] on the wire outside" or "over the wire of the [predominantly black] church next door."  *Id.* at 17; Docket Item 18 at 5.  He suggested that "they'd get a kick [out of] that" and asked whether shoes strung over a telephone wire means that the area is "gang territory" or a locale where "they sell drugs."  Docket Item 12 at 17; Docket Item 18 at 5.  And Dubie's coworkers engaged customers in conversations that "degraded the predominantly black areas" in which Buffalo Concrete is located.  Docket Item 12 at 16.

Dubie also "experienced what felt and seemed like personal attacks regarding [her] work performance."  Docket Item 3 at 2.  These attacks "happened regularly, daily[,] and throughout the week" during the entirety of Dubie's employment.  *Id.*; *see also* Docket Item 1 at ¶¶ 5-6.  Indeed, the attacks happened so often that they affected Dubie's emotional, mental, and physical well-being.  Docket Item 3 at 2; *see* Docket Item 12 at 17.

Dubie was the "[f]irst to be accused of mistakes."  Docket Item 12 at 17.  And Hartley "often publicly belittled [and] reprimanded [Dubie]," sometimes "in front of . . . management."  *Id.* at 16.  She yelled "loudly in [Dubie's] face" and singled Dubie out by accusing her of smoking in the bathroom.  *Id.*  Management did not address Hartley's behavior even though it violated the employee handbook.  *Id.*  Hartley's conduct was so upsetting to Dubie that on June 4, 2019, Dubie emailed Hartley to request that "[f]or the sake of professionalism," the two "privately address matters/duties [that Hartley felt Dubie was] not doing 'correctly.'"  Docket Item 12 at 10.

Dubie's coworkers treated her badly in other ways as well.  They took issue with the amount of time that Dubie was absent from work and "[m]ock[ed her] to customers."  Docket Item 12 at 16.  When Dubie suggested that Buffalo Concrete hire her son for an open position, Kathy Grimm, Buffalo Concrete's owner and president, Docket Item 18 at 5, told Dubie that she had a "rule to not hire family" even though Grimm hired another coworker's "long[-]time, live[-]in girlfriend" later that very day, Docket Item 12 at 16.  And although Dubie was told that only "[n]ew hires" have to "set up coffee" for Hartley, she was forced to continue making coffee for Hartley even after other employees joined Buffalo Concrete.  *Id.* at 17.

Dubie raised her concerns about her coworkers' behavior three times with Grimm, but Grimm "failed to hear [her] grievances on" each occasion.  Docket Item 1 at ¶ 19.  Although Grimm "was charged . . . with [stopping] such treatment," Docket Item 18 at 5, she "[a]llow[ed] the acts to continue," Docket Item 1 at ¶ 19, and implied that Dubie should be grateful for "everything everyone [at Buffalo Concrete] did for [her]," Docket Item 12 at 17.

At some point during Dubie's employment, a "tenant" of Buffalo Concrete, Bob Young, made an "implied sexual innuendo" about Dubie and Gaglio, the general manager.  Docket Item 1 at ¶ 19; Docket Item 12 at 16.  Young told Dubie that to "keep [her] employment," she should "schmooze up to [Gaglio] a little" and "[j]ust kiss up to [him] a bit."  Docket Item 1 at ¶ 19; Docket Item 12 at 16.  This "advice" had sexual connotations that Dubie found "demean[ing]."  Docket Item 12 at 16.

On January 9, 2020, Dubie "went into a full depressive episode" and stopped going to work.  Docket Item 18 at 6.  On January 10, 2020, Gaglio and his wife purchased Buffalo Concrete.  *Id.*  Grimm then told Dubie to contact Gaglio about her medical condition, and Gaglio and his wife told Dubie to return to work with a doctor's note.  *Id.*  Then, on January 17, 2020, "the Gaglios terminated [Dubie] via text."  *Id.*  When Dubie applied for unemployment, the Gaglios "caused its denial."  *Id.*

On August 13, 2020, Dubie filed an EEOC charge.  Docket Item 3 at 2.  In the EEOC charge, Dubie indicated that Buffalo Concrete discriminated against her based on her race and color.  *Id.*  The EEOC issued a "right-to-sue letter" and notice on March 16, 2021.  *Id.* at 3-4.  The notice instructed Dubie that any lawsuit she may wish to file "under federal law . . . **must be filed WITHIN 90 DAYS of your receipt of this notice**;

or your right to sue based on this charge will be lost." *Id.* at 4 (bold emphasis, capitalization, and underlining in original). Dubie received the notice on March 16, 2021—the same day it was issued. Docket Item 1 at ¶¶ 12, 18.

## PROCEDURAL BACKGROUND

After Dubie filed her first complaint, Buffalo Concrete moved to dismiss her suit. Docket Item 8. The parties then briefed the motion, Docket Items 12-16, and this Court found that Dubie's claims were subject to dismissal for several reasons, Docket Item 17. First, the Court found that Dubie had "failed to plead that Buffalo Concrete is an employer within the meaning of Title VII." *Id.* at 5-7. Second, it found that based on the allegations in Dubie's original complaint, her suit was untimely. *Id.* at 7-9. Third, it found that Dubie "[had] not exhausted administrative remedies for her sexual harassment claim and ha[d] not plausibly alleged an exception to the exhaustion requirement." *Id.* at 9-12. Fourth, it found that Dubie had failed to state a claim for racial discrimination because the allegations in Dubie's original complaint "d[id] not plausibly support even a minimal inference of discriminatory motivation." *Id.* at 12-15. Fifth, it found that Dubie failed to state a viable retaliation claim because she "ha[d] not alleged that she suffered adverse action as a result of a protected activity." *Id.* at 15-16. Finally, it found that Dubie's complaint "fail[ed] to state a timely claim for a hostile work environment." *Id.* at 16-19.

The Court granted Dubie leave to file an amended complaint, "within 45 days [of the decision], to correct the deficiencies noted [in the decision]." *Id.* at 19-20. On May

19, 2022, Dubie filed an amended complaint.  Docket Item 18.[3]  Buffalo Concrete then moved to dismiss a second time, Docket Item 19, and Dubie failed to respond, *see* Docket Items 24-27, as noted above.

## **LEGAL STANDARD**

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.* (citing *Twombly*, 550 U.S. at 556).  "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully."  *Id.* (quoting *Twombly*, 550 U.S. at 556).  "Although the statute of limitations is ordinarily an affirmative defense that must be raised in the answer, a statute of limitations defense may be decided on a Rule 12(b)(6) motion if the defense appears on the face of the complaint."  *Conn. Gen. Life Ins. Co. v. BioHealth Labs., Inc.*, 988 F.3d 127, 131-32 (2d Cir. 2021) (quoting *Thea v. Kleinhandler*, 807 F.3d 492, 501 (2d Cir. 2015)).

---

[3] Dubie filed her amended complaint a week late—52 days after the Court issued its decision.  *See* Docket Items 17 and 18.  But in light of Dubie's *pro se* status, the Court excuses the late filing.

**DISCUSSION**

Buffalo Concrete asserts the same arguments in its second motion to dismiss as it did in its first.  It argues that Dubie has not alleged that Buffalo Concrete is an "employer" within the meaning of Title VII and that Dubie's suit is time-barred.  Docket Item 20 at 16-19.  It also argues that Dubie failed to exhaust her administrative remedies on her sexual harassment claims.  *Id.* at 19-20.  Finally, it argues that even after amending her complaint, Dubie has failed to plausibly state racial discrimination, retaliation, and hostile work environment claims.  *Id.* at 20-28.  As it did in its previous decision, the Court addresses each argument in turn.

**I.    EMPLOYER STATUS UNDER TITLE VII**

Title VII "makes it unlawful for an employer 'to fail or refuse to hire[,] or to discharge[,] any individual, or otherwise to discriminate against any individual with respect to [her] compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin.'"  *Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 85 (2d Cir. 2015) (quoting 42 U.S.C. § 2000e-2(a)(1)).  But it applies only to entities that meet the statute's definition of "employer."  *Arculeo v. On-Site Sales & Mktg., LLC*, 425 F.3d 193, 197 (2d Cir. 2005).  Under Title VII, an "employer" is defined as "a person engaged in an industry affecting commerce who has fifteen or more employees for each working day in each of twenty or more calendar weeks in the current or preceding calendar year."  42 U.S.C. § 2000e(b).

That requirement of fifteen or more employees is a substantive element of a plaintiff's Title VII claim.  *Arbaugh v. Y&H Corp.*, 546 U.S. 500, 504, 516 (2006) ("[T]he threshold number of employees for application of Title VII is an element of a plaintiff's

claim for relief, not a jurisdictional issue.").  Therefore, to survive a motion to dismiss, a plaintiff raising a Title VII claim must allege facts plausibly suggesting that her employer is covered by Title VII.  *Shultz v. Valley View Cheese, Inc.*, 2021 WL 4025248, at *3 (W.D.N.Y. Sept. 2, 2021).

Dubie does not allege either in her original complaint or her amended complaint that Buffalo Concrete employed fifteen or more employees.  Docket Items 1 and 18. Her original complaint alleged that Buffalo Concrete had only five to ten employees, Docket Item 1 at ¶ 2; her amended complaint is silent about the number of people employed by Buffalo Concrete, Docket Item 18.[4]

Dubie has not plausibly alleged that Buffalo Concrete had fifteen or more employees for twenty or more weeks of the year.  She therefore has failed to plead that Buffalo Concrete is an employer within the meaning of Title VII, and her Title VII claim is therefore dismissed.[5]

_____

[4] In its first decision, the Court informed Dubie that if she were uncertain about the number of employees Buffalo Concrete had but believed it had at least fifteen employees, she could allege that fact "based upon her 'information and belief.'"  Docket Item 17 at 7 n.5 (citing *Arista Records, LLC v. Doe 3*, 604 F.3d 110, 120 (2d Cir. 2010)). She did not do that.  *See* Docket Item 18.

Further, the Court noted that in her response to the first motion to dismiss, Dubie "raise[d] new allegations about who worked at Buffalo Concrete."  Docket Item 17 at 6 (citing Docket Item 13 at 3-4).  The Court instructed Dubie that "any facts that [she] wants the Court to consider should be pleaded in any amended complaint and not raised in a response," *id.* at 6 n.4, and noted that the allegations raised in Dubie's response "still do not plausibly suggest that Buffalo Concrete was a covered employer under Title VII," *id.* at 6-7.

[5] Buffalo Concrete argues in the alternative that the Court should convert the motion to dismiss to a summary judgment motion and consider evidence that Buffalo Concrete employed fewer than fifteen people.  Docket Item 20 at 17-18.  Because the Court finds that Dubie failed to state a claim under Title VII, it declines to do so.

II.     **TIMELINESS**

Title VII claims must be filed in federal court within 90 days of the claimant's

receipt of a right-to-sue letter from the EEOC.  *See* 42 U.S.C. § 2000e-5(f)(1).  "The

[90-day] period is measured in calendar days, not business days."  *Carpenter v. City of*

*New York*, 2011 WL 2118599, at *2 (W.D.N.Y. May 25, 2011).  And the deadline is

strict.  *See Manley v. N.Y.C. Police Dep't*, 2005 WL 2664220, at *3-5 (E.D.N.Y. Oct. 19,

2005) (dismissing *pro se* plaintiff's claims as untimely when plaintiff filed complaint 91

days after receiving right-to-sue letter); *see also Hughes v. Elmira Coll.*, 584 F. Supp. 2d

588, 590 (W.D.N.Y. 2008) (same).  In fact, "in the absence of a recognized equitable

consideration, the court cannot extend the limitations period by even one day."  *Johnson*

*v. Al Tech Specialties Steel Corp.,* 731 F.2d 143, 146 (2d Cir. 1984) (citation omitted).

In her original complaint, Dubie alleged that she received the right-to-sue letter

on March 16, 2021.  Docket Item 1 at ¶¶ 12, 18.  She filed her suit on June 16, 2021—

92 days later.  Docket Item 1.  In her response to the first motion to dismiss, Dubie

alleged that she actually received the EEOC's right-to-sue letter on March 20, 2021,

Docket Item 13 at 4-5, meaning that her suit—filed 88 days later—would have been

timely.

In its earlier decision, this Court noted that Dubie's allegation that she received

the letter on March 16, 2021—the same day it was issued—"may well be a

typographical error or otherwise simply a mistake."  Docket Item 17 at 8 n.6.  The Court

therefore instructed Dubie that "any amended complaint . . . should clarify the precise

date on which she received the right-to-sue letter."  *Id.* at 9 n.9.  But Dubie's amended

complaint does not allege that she received the letter on March 20, 2021; in fact, it

completely fails to address when she received the letter.  Docket Item 18.

11

Based on the allegations in Dubie's complaints, her Title VII claim was untimely and is dismissed for that reason as well.

## III.   EXHAUSTION OF REMEDIES FOR SEXUAL HARASSMENT CLAIMS

"Title VII requires a plaintiff to exhaust administrative remedies before filing suit in federal court." *Fowlkes v. Ironworkers Loc. 40*, 790 F.3d 378, 384 (2d Cir. 2015) (citations omitted).  Under a narrow exception to the exhaustion requirement, "claims not raised in an EEOC complaint may still be part of the complaint later filed in federal court if they are reasonably related to the claim filed with the agency." *Littlejohn v. City of New York*, 795 F.3d 297, 322 (2d Cir. 2015) (citation and internal quotation marks omitted).  A claim is reasonably related "if the conduct complained of would fall within the scope of the EEOC investigation which can reasonably be expected to grow out of the charge that was made." *Id.* (citation omitted).

Dubie's EEOC charge focused solely on discrimination based on race and color, not sex:  She checked boxes indicating that she was discriminated against based only on race and color, and she left the box labeled "sex" blank.  *See* Docket Item 3 at 2.  Likewise, the allegations in the EEOC charge addressed only race-based comments by Gaglio and others.  *Id.*  And while Dubie explicitly charged that she had been "discriminated against because of [her] race . . . and color," she made no mention of discrimination based on sex.  *Id.*

Moreover, the sexual harassment claims raised in this Court are not "reasonably related" to the claims raised in Dubie's EEOC charge.  Dubie alleges that Bob Young, a "tenant" of Buffalo Concrete, Docket Item 1 at ¶ 19, told her to "schmooze up to [Gaglio]

a little" and "[j]ust kiss up to [Gaglio] a bit," Docket Item 12 at 16.[6]  She says that this

"advice" about how she might "keep [her] employment" had sexual connotations and

that she found it "demean[ing]."  Docket Item 1 at ¶ 19; Docket Item 12 at 16.  But that

allegation of sexual harassment has nothing to do with the race- and color-based

discrimination Dubie alleged in her EEOC charge.  It therefore does not "fall within the

scope of the EEOC investigation which can reasonably be expected to grow out of the

charge that was made."  *See Littlejohn*, 795 F.3d at 322.  In fact, Young was not

involved in the alleged racial discrimination described in the EEOC charge.  *Cf. id.* at

323 (sexual harassment claim was not "reasonably related" to EEOC racial

discrimination claims where alleged perpetrator of sexual harassment was not involved

in alleged racial discrimination).  So Dubie's allegations of sexual harassment and racial

discrimination seem to be completely unrelated.

In her response to the first motion to dismiss, Dubie argued that she did exhaust

her administrative remedies on her sexual harassment claims or, alternatively, that her

failure to exhaust should be excused.  Docket Item 13.  But the Court found that these

arguments had no merit, Docket Item 17 at 10-12, and Dubie has not asserted them

again—or made any other arguments—in response to Buffalo Concrete's second

motion to dismiss.  Nor has she included facts in her amended complaint addressing the

exhaustion requirement.  Docket Item 18.

---

[6] Dubie requests a subpoena of Young and Gaglio "in order to get the truth"—presumably, "the truth" surrounding this interaction.  Docket Item 18 at 7.  That request is denied.  It was premature, *Micolo v. Fuller*, 2016 WL 158591, at *2 (W.D.N.Y. Jan. 13, 2016) ("Local Rule of Civil Procedure 26(b) provides that '[s]ubject to the requirements of Fed. R. Civ. P. 26(a)(1), a party may not seek discovery from any source prior to the Rule 26(f) conference, absent the parties' agreement or a Court order setting a discovery schedule.'") (alteration in original), and is now moot.

Dubie did not exhaust administrative remedies for her sexual harassment claim and has not plausibly alleged an exception to the exhaustion requirement, and her sexual harassment claim is dismissed for that reason as well.

## IV.   FAILURE TO STATE A CLAIM

### A.   Racial Discrimination

To state a *prima facie* case of racial discrimination under Title VII, the plaintiff must show "(1) that she is a member of a protected class; (2) that she was qualified for employment in the position; (3) that she suffered an adverse employment action; and [(4) that she has] some minimal evidence suggesting an inference that the employer acted with discriminatory motivation." *Littlejohn*, 795 F.3d at 307.  If she meets her burden, the defendant is presumed to have unlawfully discriminated against her, and the burden shifts to the defendant to articulate a legitimate, nondiscriminatory reason for the adverse employment action.  *Id.*  If the defendant makes that showing, the burden shifts back to the plaintiff to show that the defendant's stated reason is pretextual.  *Id.* at 307-08.

An adverse employment action is "a materially significant disadvantage with respect to the terms of the plaintiff's employment."  *Id.* at 312 n.10 (alterations and emphasis omitted) (quoting *Williams v. R.H. Donnelley, Corp.*, 368 F.3d 123, 128 (2d Cir. 2004)).  An action must be "more disruptive than a mere inconvenience or an alteration of job responsibilities" to be an adverse employment action.  *Id.* (quoting *Galabya v. N.Y.C. Bd. of Educ.*, 202 F.3d 636, 640 (2d Cir. 2000)).  "Examples of materially significant disadvantages include termination, demotion, a less distinguished title, a material loss of benefits, or significantly diminished material responsibilities."  *Id.*

(alternations and internal quotation marks omitted) (citing *Galabya*, 202 F.3d at 640). But "criticism of an employee . . . is not an adverse employment action," *Tepperwien v. Entergy Nuclear Operations., Inc.*, 663 F.3d 556, 570 (2d Cir. 2011) (quoting *Weeks v. N.Y. State (Div. of Parole)*, 273 F.3d 76, 86 (2d Cir. 2001)); nor are "reprimands" or "excessive scrutiny" unless they are accompanied by "other negative results such as a decrease in pay or being placed on probation," *Honey v. Cnty. of Rockland*, 200 F. Supp. 2d 311, 320-21 (S.D.N.Y. 2002) (collecting cases).

To state a viable claim, an employment-discrimination plaintiff must plead "enough nonconclusory factual matter to nudge her claim[s] across the line from conceivable to plausible." *Mandala v. NTT Data, Inc.*, 975 F.3d 202, 208 (2d Cir. 2020) (alterations, citations, and internal quotation marks omitted). More specifically, to defeat a motion to dismiss, an employment-discrimination plaintiff alleging racial discrimination under Title VII "need only give plausible support to a minimal inference of discriminatory motivation" behind an adverse employment action. *Vega*, 801 F.3d at 84; *Littlejohn*, 795 F.3d at 306, 311. "An inference of discrimination can arise from circumstances including, but not limited to, [1] 'the employer's criticism of the plaintiff's performance in ethnically degrading terms; [2] its invidious comments about others in the employee's protected group; [3] the more favorable treatment of employees not in the protected group; [4] the sequence of events leading to the plaintiff's discharge'[; or 5] . . . when an employer replaces a terminated or demoted employee with an individual outside the employee's protected class." *Littlejohn*, 795 F.3d at 312-13 (citations omitted).

Although "actions or remarks made by decisionmakers that could be viewed as reflecting a discriminatory animus" may give rise to an inference of discrimination,

15

*Chertkova v. Conn. Gen. Life Ins. Co.*, 92 F.3d 81, 91 (2d Cir.1996), "'stray remarks' alone do not support a discrimination suit," *Danzer v. Norden Sys., Inc.*, 151 F.3d 50, 56 (2d Cir. 1998).  "In determining whether a remark is probative [of discriminatory intent], [courts] have considered four factors: (1) who made the remark (i.e., a decision-maker, a supervisor, or a low-level co-worker); (2) when the remark was made in relation to the employment decision at issue; (3) the content of the remark (i.e., whether a reasonable juror could view the remark as discriminatory); and (4) the context in which the remark was made (i.e., whether it was related to the decision-making process)."  *Henry v. Wyeth Pharm., Inc.*, 616 F.3d 134, 149 (2d Cir. 2010).  And "[c]ourts in the Second Circuit routinely dismiss discrimination claims where the only allegations made in support are stray remarks by non-decisionmakers wholly unconnected to the adverse employment action underlying the claim."  *Ahmad v. White Plains City Sch. Dist.*, 2019 WL 3202747, at *5 (S.D.N.Y. July 16, 2019) (collecting cases).

Dubie alleges that on January 17, 2021, "the Gaglios terminated [her] via text." Docket Item 18 at 6.  She therefore has alleged an adverse employment action.  *See Littlejohn*, 795 F.3d at 312 n.10.  But none of Dubie's other allegations, including the alleged "personal attacks regarding [her] work performance," Docket Item 3 at 2, rise to the level of a "materially significant disadvantage" as required for an adverse employment action, *see Littlejohn*, 795 F.3d at 312 n.10; *see also Tepperwien*, 663 F.3d at 570; *Honey*, 200 F. Supp. 2d at 320-21.

What is more, Dubie has not plausibly alleged circumstances giving rise to an inference that racial discrimination triggered her termination.  First, she has not alleged that most of the employees who allegedly made racist remarks had any decision-

making authority surrounding her termination.  *See* Docket Items 1, 3, and 18; *see also* Docket Item 12 at 16-17.  For example, while she alleges that Hartley was a supervisor, Docket Item 18 at 3, and that Brege was the warehouse manager, *id.* at 4, she does not say that either had the authority to hire and fire, *see* Docket Items 1, 3, and 18; *see also* Docket Item 12 at 16-17.  She says nothing about Buchnowski's role.  Docket Item 12 at 16.  And Dubie has not alleged that any of those three employees influenced the Gaglios' decision to terminate her.  *See* Docket Item 3 at 2; Docket Item 18 at 5-6.

Dubie does allege that Gaglio led the other employees in their discriminatory conduct, Docket Item 1 at ¶ 19, but she does not allege any specific conduct or remarks by Gaglio that might be sufficient to support a reasonable inference that Gaglio terminated Dubie because of her race.  For example, she does not allege that Gaglio "critici[zed] her performance in ethnically degrading terms" or replaced her "with an individual outside [Dubie's] protected class."  *See Littlejohn*, 795 F.3d at 312-13; *see also* Docket Item 1 at 5; Docket Item 3 at 2; Docket Item 18 at 6.  Nor has she alleged specific "invidious comments" made by Gaglio about other members of Dubie's protected class.  *See Littlejohn*, 795 F.3d at 312; *see also* Docket Item 1 at 5; Docket Item 3 at 2; Docket Item 18 at 6.  In fact, the only specific comment that Dubie attributes to Gaglio is his statement, "[W]e now got ourselves a Celest, a Xavier, and a Kari," referring to Dubie, a Puerto Rican employee, and a Native American employee.  Docket Item 12 at 16.  Buchnowski's alleged response to this comment—"Yeah[,] we got ourselves a regular 'fuckin[g]' bowl of Mexican soup [a]round here now," *id.*—may have been "invidious," *see Littlejohn*, 795 F.3d at 312, but Gaglio's statement did not comment on the employees' races.

17

And even if Dubie had alleged facts sufficient to support an inference of discrimination, the complaint makes clear that the "sequence of events leading to [Dubie's] discharge" did not involve any race-based comments or actions by Gaglio. *See Littlejohn*, 795 F.3d at 312-13; Dubie says that on January 9, 2020, she "went into a full depressive episode," Docket Item 18 at 6, stopped going to work, *id.*, and was terminated by text a week later, *id.* She does not allege that Gaglio or his wife made racist remarks when they terminated her or even that her race played a role in the decision to terminate her employment. *See id.* In fact, the only racial comment that Dubie alleges was made around the time of her termination was Brege's remark about throwing her shoes over a telephone wire. *Id.* at 5. But Dubie does not allege that this comment was connected to her termination in any way. Docket Items 1 and 18.

Dubie's allegations do not plausibly support an inference of discriminatory motivation, and she has failed to state a viable claim for racial discrimination. That claim is dismissed for that reason as well.

### B.    Retaliation

To establish a *prima facie* case of retaliation under Title VII, "a plaintiff must demonstrate that (1) she engaged in protected activity; (2) the employer was aware of that activity; (3) the employee suffered a materially adverse action; and (4) there was a causal connection between the protected activity and that adverse action." *Kelly v. Howard I. Shapiro & Assocs. Consulting Eng'rs, P.C.*, 716 F.3d 10, 14 (2d Cir. 2013) (citation and internal quotation marks omitted).

"'Protected activity' includes opposition to a discriminatory employment practice," *Hubbard v. Total Commc'ns., Inc.*, 347 F. App'x 679, 680-81 (2d Cir. 2009) (summary

order), and encompasses "informal protests" such as "making complaints to management," *Belton v. Borg & Ide Imaging, P.C.*, 512 F. Supp. 3d 433, 445 (W.D.N.Y. 2021) (citation omitted).  "But such [informal] complaints must be sufficiently specific so that the employer is put on notice that the plaintiff believes she is being discriminated against on the basis of a protected characteristic." *Id.* (alternations, citations, and internal quotation marks omitted); *see also Brummell v. Webster Cent. Sch. Dist.*, 2009 WL 232789, at *5 (W.D.N.Y. Jan. 29, 2009).  In other words, "[g]eneralized complaints" about mistreatment are insufficient.  *McCullough v. John T. Mather Hosp. of Port Jefferson, N.Y., Inc.*, 2019 WL 1755436, at *8 (Apr. 19, 2019).  "To the extent that an employee complains about perceived 'unfair' treatment relating to job responsibility, hiring practices, or corporate policy, but fails to link the treatment to unlawful discrimination or to h[er] protected status, [s]he fails to establish that [s]he was engaged in [a] protected activity." *Id.* (citation omitted).

Dubie alleges that she spoke to Grimm three times about her "grievances," but she does not allege what issues she attempted to raise with Grimm, let alone that she told Grimm she was "being discriminated against on the basis of" her race or some other protected characteristic.  Docket Item 1 at ¶ 19; *see Belton*, 512 F. Supp. 3d at 445.  Those allegations are insufficient to support an inference that Buffalo Concrete was "on notice" that Dubie believed she was being discriminated against based on her race.  *See Belton*, 512 F. Supp. 3d at 445.

Dubie therefore has failed to state a viable retaliation claim, and her retaliation claim is dismissed for that reason as well.

### C.      Hostile Work Environment

"Under Title VII, an employee seeking to bring a hostile work environment claim must show [1] that she . . . is a member of a protected class; [2] that she suffered unwelcome harassment; [3] that she was harassed because of her membership in a protected class; and [4] that the harassment was sufficiently severe or pervasive to alter the conditions of employment and create an abusive work environment."  *Monterroso v. Sullivan & Cromwell, LLP*, 591 F. Supp. 2d 567, 584 (S.D.N.Y. 2008).  "This test has objective and subjective elements: the misconduct shown must be 'severe or pervasive enough to create an objectively hostile or abusive work environment,' and the victim must also subjectively perceive that environment to be abusive."  *Alfano v. Costello*, 294 F.3d 365, 374 (2d Cir. 2002) (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)).  Courts look at the totality of the circumstances and examine factors including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance."  *Harris*, 510 U.S. at 23.

Although "[t]he standard for a hostile work environment claim is a demanding one" and "Title VII is not intended to create a code of civility," *Scott v. Mem'l Sloan-Kettering Cancer Ctr.*, 190 F. Supp. 2d 590, 599 (S.D.N.Y. 2002), the Second Circuit "ha[s] repeatedly cautioned against setting the bar too high," *Terry v. Ashcroft*, 336 F.3d 128, 148 (2d Cir. 2003).

> "[W]hile a mild, isolated incident does not make a work environment hostile, the test is whether 'the harassment is of such quality or quantity that a reasonable employee would find the conditions of her employment altered for the worse.'"  The environment need not be "unendurable" or "intolerable." Nor must the victim's "psychological well-being" be damaged.  In short, "'the fact that the law requires harassment to be severe or pervasive before it

can be actionable does not mean that employers are free from liability in all
but the most egregious cases.'"

*Id.* (citations and emphasis omitted).

Although "discrete claims of discrimination and retaliation must be brought within
the 300-day limitations period to be actionable, a different rule applies with regard to
hostile work environment claims." *Zoulas v. N.Y.C. Dep't of Educ.*, 400 F. Supp. 3d 25,
50 (S.D.N.Y. 2019) (citation omitted).  Because the "very nature [of hostile work
environment claims] involves repeated conduct," *Nat'l R.R. Passenger Corp. v. Morgan*,
536 U.S. 101, 115 (2002), "as long as any act contributing to the hostile work
environment claim falls within the 300-day period, 'the entire time period of the hostile
environment may be considered by a court for the purposes of determining liability.'"
*Zoulas*, 400 F. Supp. 3d at 50 (quoting *Morgan*, 536 U.S. at 117).  This "continuing
violation theory may be used where there have been specific and related instances of
discrimination, and the employer has permitted them to continue unremedied for so long
that its inaction may reasonably be viewed as tantamount to a policy or practice of
tolerating such discrimination."  *Fitzgerald v. Henderson*, 251 F.3d 345, 362 (2d Cir.
2001).  "A court's task is to determine whether the acts about which an employee
complains are part of the same actionable hostile work environment practice."  *Morgan*,
536 U.S. at 120.

Dubie filed her EEOC charge on August 13, 2020.  Docket Item 1 at ¶ 8; Docket
Item 3 at 2.  Therefore, if an act contributing to the hostile work environment occurred
within 300 days before that—that is, on or after October 18, 2019—the entire time
period of her hostile work environment may be considered.

Dubie alleges that she was subject to "microaggression[s]," racial bias, workplace harassment, racial slurs, and racist jokes and stereotypes throughout her employment at Buffalo Concrete.  Docket Item 1 at ¶¶ 5, 6, 13.  Specifically, she says in her original complaint that discriminatory acts occurred between May 16, 2019, and June 4, 2019; on June 10, August 1, September 1, November 1, and December 1, 2019; in October 2019; and on January 3, 2020.  *Id.* at ¶ 6.  Dubie clarified in her amended complaint that she listed the "1st of each month . . . because the disparate treatment happened regularly enough that if [she] survived 'one' [month] without incident, [it] was a small internal celebration."  Docket Item 18 at 4.  But in both the original and amended complaint, the only specific incident that falls within the 300-day period occurred on January 3, 2020, when Brege told Dubie to throw her shoes over a telephone wire and asked whether shoes strung over a wire indicates that a neighborhood is "gang territory."  *Id.* at 5; Docket Item 12 at 17.

This comment—which Dubie alleges had racial undertones—is plausibly "related" to the alleged pattern of racial bias and racist slurs, jokes, and stereotypes about which Dubie complains.  *See Fitzgerald*, 251 F.3d at 362; Docket Item 1 at ¶ 13.  The Court therefore may consider the acts that contributed to Dubie's hostile work environment claim that occurred before the 300-day statute of limitations period.  *Zoulas*, 400 F. Supp. 3d at 50 (citing *Morgan*, 536 U.S. at 117).

And considering all her allegations in context, Dubie may well have stated a claim for a hostile work environment.  She describes five specific instances in which her coworkers made allegedly racist or race-based comments toward her, Docket Item 18 at 3 (Hartley's discussion of Buffalo Concrete's "previous Black female employees");

22

Docket Item 12 at 16 (Brege's use of the word "roots" when telling a joke about a black warehouse employee; Hartley's use of the phrase "I haven't seen you in a coon's year" while looking at Dubie; Buchnowski's "Mexican soup" comment); *id.* at 17 (Brege's remarks about the shoes and the telephone wire), and she alleges that she was subject to "disparate treatment" so regularly that there "was a small internal celebration" if she "survived" one month without incident, Docket Item 18 at 4.  Based on these allegations, it certainly is plausible that Dubie was subject to "harassment [that] was sufficiently severe or pervasive to alter the conditions of [her] employment," as is required for a hostile work environment claim.  *See Monterroso*, 591 F. Supp. 2d at 584.

But because Dubie's Title VII claims are subject to dismissal on other grounds, *see* discussion *supra* Sections I and II, this Court does not reach the merits of her hostile work environment claim.

## <u>CONCLUSION</u>

For the reasons stated above, Buffalo Concrete's motion to dismiss, Docket Item 19, is GRANTED.  The Clerk of the Court shall close the case.


SO ORDERED.

Dated:   December 20, 2022
          Buffalo, New York


                                         */s/ Lawrence J. Vilardo*
                                        LAWRENCE J. VILARDO
                                        UNITED STATES DISTRICT JUDGE